## UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROHIT JAIN, Derivatively on Behalf of UBER TECHNOLOGIES, INC., | ) ) | Civil Action No. |
| Plaintiff, | ) ) | |
| vs. | ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| DARA KHOSROWSHAHI, RONALD SUGAR, URSULA BURNS, WAN LING MARTELLO, JOHN THAIN, DAVID TRUJILLO, AMANDA GINSBERG, ROBERT ECKERT, REVATHI ADVAITHI, ALEXANDER WYNAENDTS, NIKKI KRISHNAMURTHY, and NELSON CHAI, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| - and - | ) ) | |
| UBER TECHNOLOGIES, INC., a Delaware Corporation, | ) ) | |
| Nominal Defendants. | ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, CORPORATE WASTE, CONTRIBUTION, AND VIOLATIONS OF THE FEDERAL SECURITIES LAWS

ROBBINS GELLER RUDMAN
  & DOWD LLP
Benny C. Goodman III
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

JOHNSON FISTEL, LLP
Michael I. Fistel, Jr.
Mary Ellen Conner
Enoch P. Hicks
40 Powder Springs Street
Marietta, GA 30064
(470) 632-6000

ROBBINS GELLER RUDMAN
  & DOWD LLP
Christopher H. Lyons (#5493)
Tayler D. Bolton (#6640)
1521 Concord Pike, Suite 301
Wilmington, DE 19803
(302) 467-2660

"It almost felt like the driver was just waiting for someone to get in the car and like a young girl to take advantage of," said Alex, an Uber sexual assault survivor.

1.      This is a shareholder derivative action.  Nominal defendant Uber Technologies, Inc. ("Uber" or the "Company") seeks damages and equitable relief against certain members of its Board of Directors ("Board") – defendants Dara Khosrowshahi, Ronald Sugar, Ursula Burns, Wan Ling Martello, John Thain, David Trujillo, Amanda Ginsberg, Robert Eckert, Revathi Advaithi, and Alexander Wynaendts, – and certain members of its senior executive leadership team – defendants Nikki Krishnamurthy, Chief People Officer; and Nelson Chai, former CFO (together, "defendants").  Defendants' disdain for legal compliance and neglect for passenger safety has, and continues to damage Uber's business, goodwill, and reputation.  Uber is also entitled to contribution and indemnification by and against defendants for damages to Uber proximately caused by defendants' actual knowledge and/or willful blindness to sexual assaults on rideshare passengers by Uber drivers.

## INTRODUCTION

2.      Founded in San Francisco, California as Ubercab, Inc., in 2009, today Uber is one of the largest ridesharing companies on the planet, with 74% of the ride-hailing market in 2024. The Company operates in approximately 70 countries and in over 10,000 cities, including large U.S. cities like Los Angeles, San Francisco, and New York.  According to its public filings, Uber makes 28 million rides per day.  In 2023, the Company booked $37.2 billion in revenues, up 163.8% from $14.1 billion in 2019 when Uber became a publicly traded company.  In 2023, Uber carried passengers on over 9.4 billion trips, up 36.2% from 6.9 billion in 2019, and had approximately 30,400 employees, up 13% from 26,900 in 2019.

3.      Uber's rapid expansion has made its top insiders rich.  For example, between 2019 and 2022, Uber Chief Executive Officer, Dara Khosrowshahi, pocketed over $98.8 million.

Similarly, Uber's highest paid executives in 2019 through 2022 collectively pocketed over $229 million.  Ubers directors also fared very well.  For part-time work, they took home over $14.1 million between 2019 and 2022.

4.     Uber's profit over passenger safety approach personally enriched defendants and served them well.  Uber passengers, however, not so much.

5.     The Uber app has become dangerous due to Uber's neglect for passenger safety.  As Uber grew rapidly far too many women experienced sexual assaults or harassment by Uber drivers.  A June 2022 U.S. Safety Report prepared by Uber revealed over 9,000 sexual assault reports were filed by Uber riders in recent years, including 141 cases of rape in 2020, the last year for which Uber publicly released data.  The sexual assault reports by passengers linked to Uber drivers included, among other things, non-consensual sexual penetration, unwanted kissing on a sexual body part, unwarranted touching of a sexual body part, attempted nonconsensual sexual penetration, and non-consensual kissing on a non-sexual body part.

6.     To increase profits, during this time Uber marketed directly to women to increase its ridership, *i.e.*, revenues.  Across Uber's advertising and media channels the Company presented itself as safe transportation for women and especially young women when in fact it was not.  Uber's website page on Safety and Women, for example, falsely stated:  "We're dedicated to building a platform where women feel safe."  Further, on a "Women's Safety" page on its website, Uber represented that it was "driving change for women's safety," claiming that "sexual assault and gender-based violence don't belong anywhere in our communities, which is why Uber is committed to help stop incidents before they happen" and highlighting its "safety features and education" and "transparency."

7.     However, Uber's actual, lived-in commitment to women's passenger safety is different.  Rather than adopt rigorous internal controls, including passenger safety measures like biometrics, in-car cameras and/or enhanced driver background checks and screening, Uber used a cursory background check process that enabled drivers to more quickly sign-up for Uber, driving up Uber's profits.  Uber's superficial safety efforts allowed drivers with histories of sexual misconduct to sign-up for Uber and then continue driving for Uber with disastrous consequences.

8.     Although aware of more than 9,000 sexual assaults of passengers linked to Uber drivers between 2017 and 2020, defendants tried to downplay results of Uber's passenger sexual assault safety studies, focusing on the decline in the incidence of sexual assaults linked to Uber rides while ignoring that thousands of individuals who continued to be victims of sexual assault, including rape, while using Uber's ridesharing service.

9.     The essential purpose of a passenger transportation company, like Uber, is to move a passenger from Point A to Point B safely.  When it fails to be able to safely transport a passenger, that failure becomes an existential threat to the company.  Where, in the pursuit of profits the leadership of a Delaware corporation neglects passenger safety, resulting in an alarming number of sexual assaults, including rapes, the corporation's directors and officers act disloyally and may be liable to the corporation for breach of fiduciary duty.

10.     This is precisely the situation here.  Despite leadership's awareness of Uber's passenger sexual assault problem since at least mid-2022, defendants neglected passenger safety in their pursuit of profits, both corporate and personal.  In the short-run, Uber fared well.  But passengers not so much.  As a result of defendants' misconduct, Uber has been damaged.  The Company is now the primary defendant in hundreds of lawsuits, including claims of sexual assault

by over 1,000 passengers, many women and young women.  The Company is also subject to public scrutiny and regulatory inquiry regarding its disregard for passenger safety.

11.     On October 4, 2023, a federal multi-district litigation panel centralized all federal Uber passenger sexual assault class action lawsuits before the U.S. District Court for the Northern District of California in San Francisco, California.  When the plaintiffs initiated the motion to consolidate, there were 22 cases pending in 11 U.S. District Courts.

12.     Uber objected to the consolidation of the actions in San Francisco just miles away from its corporate headquarters.  But the federal panel overruled Uber's objection, stating "[o]n the basis of the papers filed and the hearing session held, we find that these actions involve common questions of fact, and that centralization in the Northern District of California will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."  The federal panel's order continued:  "These actions share complex factual questions arising from allegations that Uber failed to implement appropriate safety precautions to protect passengers, and that plaintiffs suffered sexual assault or harassment as a result.  Common factual questions include Uber's knowledge about the prevalence of sexual assault by Uber drivers, and whether Uber failed to conduct adequate background checks of its drivers, train drivers regarding sexual assault and harassment, implement adequate safety measures to protect passengers from sexual assault, and adequately respond to complaints about drivers.  Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel, and the judiciary."  As of January 2024, there were over 200 cases involved in the Uber passenger sexual assault multi-district litigation matters, and it is expected to increase over time.

13.     On February 15, 2024, the lead plaintiffs in the *In re Uber Technologies Sexual Assault Litigation*, MDL No. 3084, filed their Master Complaint ("Complaint").  The Complaint, which spans 99-pages and includes 513-paragraphs, alleges Uber failed to implement appropriate safety precautions to protect passengers, and that plaintiffs suffered sexual assault or harassment as a result.  The Complaint further alleges that, although Uber was aware of the prevalence of sexual assault by Uber drivers, Uber failed to conduct adequate background checks of its drivers, and train drivers regarding sexual assault and harassment, implement adequate safety measures to protect passengers from sexual assault, and adequately respond to complaints about drivers. Additionally, the Complaint seeks monetary damages, punitive damages, and injunctive relief.

14.     The Complaint's allegations regarding Uber's knowledge that it "faced an ongoing problem of its drivers assaulting or harassing its passengers" are especially damning.  The Complaint alleges that, despite being "fully aware of its sexual misconduct problem, "Uber" failed to take safety precautions to protect its passengers."  The Complaint further alleges that, "[e]ven after Uber was aware of widespread sexual misconduct on the part of its drivers, Uber and its executing officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them."  Instead, the Complaint alleges, Uber "[p]rioritizing profits over safety."

15.     Further still, the Complaint alleges that "Uber and its executive officers also made the conscious decision not to warn its customers or users of the risk of being assaulted, even after Uber and its leadership were fully aware of this risk."  Safety precautions that Uber leadership could have adopted (but did not) to improve women's passenger safety include: (i) "enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; ongoing monitoring of Uber drivers and rides through available technology including cameras and

GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers or by deviating substantially from the assigned route; a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride; a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers; creating and instituting a system encouraging customer reporting; adequate monitoring of customer complaints by well-trained and effective customer-service representatives; warnings to passengers of the dangers of being attacked by Uber drivers; and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage."

16.     Uber has been severely damaged under defendants' leadership.  Already the Company has paid millions to the California Public Utilities Commission to resolve claims arising from safety issues at Uber.  Uber also has paid millions more to resolve false advertising claims arising from the Company's marketing efforts to convince the public that Uber is safe, and not dangerous, like hitch-hiking.

17.     Nevertheless, Uber's Board has not, and will not take legal action against defendants for neglecting passenger safety.  Defendants' willful blindness towards sexual assaults that endanger women and passengers in pursuit of corporate profits has damaged the Company.  Further, the Board's willful inaction is contrary to its members' fiduciary duty to protect and preserve Uber's corporate franchise.  Accordingly, plaintiff brings this shareholder derivative action on behalf of Uber against its wayward fiduciaries.  A pre-suit demand on Uber's Board is

excused as futile.  The majority of the Board is interested in the outcome of this litigation, because they are personally liable for the misconduct particularized herein.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction under 28 U.S.C. § 1331 because certain of the claims asserted herein arise under §14(a) of the Securities Exchange Act of 1934 ("Exchange Act").  The Court has supplemental jurisdiction over the remaining state law claims asserted herein under 28 U.S.C. §1367(a).

19.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in under 28 U.S.C. §1391 because Uber's Amended and Restated Certificate of Incorporation, at Section VII, designates this District as the exclusive forum for matters of this nature.

## THE PARTIES

21.     Plaintiff Rohit Jain ("Jain") is, and continuously has been, an Uber shareholder since May 2019.  Plaintiff will adequately represent Uber's interests in the derivative claims asserted in the action.

22.     Nominal Defendant Uber is incorporated in Delaware and maintains its principal executive offices at 1515 3rd Street, San Francisco, California 94158.  Uber is a ride sharing company with an app that allows passengers to hail a ride.  At one point before its May 9, 2019 Initial Public Offering ("IPO") Uber was the most valuable startup company in the world, worth around $70 billion.  At the time of its IPO, Uber had a valuation that exceeded $80 billion.

23.     Defendant Dara Khosrowshahi ("Khosrowshahi") has been a director of Uber since September 2017.  He also has served as CEO of Uber since September 2017.  Khosrowshahi received $24,248,209 in compensation in 2023 alone, and $123,137,315 since 2019.  While Uber stock traded at artificially inflated prices, between January 2021 and November 2023, Khosrowshahi sold 600,000 shares of Uber stock for unlawful insider trading proceeds of $30,423,076 based on adverse material, non-public information.

24.     Defendant Ronald Sugar ("Sugar") has been a director of Uber since July 2018. Sugar also has served on the Compensation and Nominating and Governance Committees of Uber's Board.  Sugar received director's fees consisting of cash and stock awards worth $6,637,679 since 2019.

25.     Defendant Ursula Burns ("Burns") has been a director of Uber since October 2017. Burns also has served on the Audit and Nominating and Governance Committees of Uber's Board. Burns received director's fees consisting of cash and stock awards worth $1,068,645 since 2019.

26.     Defendant Wan Ling Martello ("Martello") has been a director of Uber since June 2017.  Martello also has served on the Compensation and Nominating and Governance Committees of Uber's Board.  Martello received director's fees consisting of cash and stock awards worth $1,085,320 since 2019.

27.     Defendant John Thain  ("Thain") has been a director of Uber since October 2017. Thain also has served on the Audit Committee of Uber's Board.  Thain received director's fees consisting of cash and stock awards worth $1,067,947 since 2019.

28.     Defendant David Trujillo ("Trujillo") has been a director of Uber since June 2017. Trujillo also has served on the Compensation and Nominating and Governance Committees of Uber's Board.

29.    Defendant Amanda Ginsberg ("Ginsberg") has been a director of Uber since February 2020.  Ginsberg also has served on the Compensation Committee of Uber's Board. Ginsberg received director's fees consisting of cash and stock awards worth $983,073 since 2020.

30.    Defendant Robert Eckert ("Eckert") has been a director of Uber since March 2020. Eckert also has served on the Compensation and Nominating and Governance Committees of Uber's Board.  Eckert received director's fees consisting of cash and stock awards worth $857,936 since 2020.

31.    Defendant Revathi Advaithi ("Advaithi") has been a director of Uber since July 2020.  Advaithi also has served on the Audit Committee of Uber's Board.  Advaithi received director's fees consisting of cash and stock awards worth $2,422,843 since 2020.

32.    Defendant Alexander Wynaendts ("Wynaendts") has been a director of Uber since March 2021.  Wynaendts also has served on the Audit Committee of Uber's Board.  Wynaendts received director's fees consisting of cash and stock awards worth $1,117,130 since 2021.

33.    Defendant Nikki Krishnamurthy ("Krishnamurthy") has been Uber's Chief People Officer since October 2018.  Krishnamurthy received $7,006,462 in compensation in 2023 alone, and $34,301,831 since 2019.

34.    Defendant Nelson Chai ("Chai") was Uber's Chief Financial Officer ("CFO") from 2018 to January 5, 2024.  Chai received $11,487,204 in compensation during in 2023 alone, and $44,735,371 since 2019.  While Uber stock traded at artificially inflated prices, in August 2023, Chai sold 100,000 shares of Uber stock for unlawful insider trading proceeds of $4,505,000 based on adverse material, non-public information.

## THE FIDUCIARY DUTIES OF UBER'S
## DIRECTORS AND OFFICERS

35.     Each director and officer of Uber owed Uber or its shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of Uber, as well as in the use and preservation of its property and assets.  The conduct of Uber's directors and officers herein involves fraudulent and unlawful misconduct – a knowing, intentional and culpable violation of their obligations as directors and officers of Uber and the absence of good faith on their part for their duties to Uber and its shareholders.  The misconduct of Uber's officers has been ratified by Uber's Board, which has failed to take any legal action on behalf of the Company against them.

36.     By reason of their positions as directors, officers and/or fiduciaries of Uber and because of their ability to control the business and corporate affairs of Uber, defendants each owed Uber and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Uber in a lawful and honest manner, and to act in furtherance of the best interests of Uber and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

37.     As directors and/or officers of a publicly held company, defendants had a duty to promptly disseminate accurate and truthful information with respect to Uber's business, and the Company's legal compliance with laws, rules and regulations applicable to ridesharing companies and similar businesses.  Moreover, defendants had a duty to speak truthfully whenever they spoke about Uber's business and/or the safety of the Company's ride sharing app for women.

38.     In addition to the duties above, the members of the Audit Committee of the Board have special duties outlined in the Charter of the Audit Committee.  Specifically, the Audit Committee directors are responsible for:  (i) "the integrity of our financial statements and financial

reporting process, including the review of our annual and quarterly financial statements and reports"; (ii) "the integrity of our accounting and financial reporting processes and systems of internal controls over financial reporting, including review with management, our independent auditors, and head of our internal audit function; (iii) "the performance of the internal audit function and plan"; (iv) "the engagement of our independent auditors and the evaluation of their qualifications, independence, and performance"; (v) "our compliance with legal and regulatory requirements, including an assessment of our compliance program"; (vi) "policies and processes for risk management and fraud prevention"; and (vii) "the Company's overall risk profile, including without limitation with respect to cybersecurity and privacy matters."

39.     In addition to the duties above, the members of the Nominating and Governance Committee of the Board have special duties outlined in the Charter of the Nominating and Governance Committee.  Specifically, the Nominating and Governance Committee directors are responsible for: (i) "periodically reviewing our corporate governance framework and recommending changes as appropriate"; (ii) "identifying, interviewing, and recruiting individuals to become members of the Board of Directors and evaluating the independence of each director and director candidate at least annually"; (iii) "periodically reviewing and making recommendations to the Board of Directors regarding the size of the Board of Directors and of its committees"; (iv) "evaluating and recommending to the Board of Directors at least annually each committee's composition"; (v) "overseeing the annual evaluation process for the Board of Directors, each committee, and each individual director, the orientation program for new directors, and a continuing education program for current directors"; (vi) "overseeing ESG matters including environmental sustainability as well as corporate political activities and contributions and lobbying activities"; (vii) "considering stockholder proposals and recommending actions on such

proposals"; and (viii) "evaluating requests by directors to serve on boards of directors of other companies."

40.     In addition to the duties above, the members of the Compensation Committee of the Board have special duties outlined in the Charter of the Compensation Committee. Specifically, the Compensation Committee directors are responsible for:  (i) "annually reviewing and approving the individual and corporate goals and objectives for our executive officers"; (ii) "establishing, reviewing, and approving salaries, bonuses, and other compensation for our executive officers"; (iii) "reviewing and approving executive compensation agreements and any material amendments"; (iv) "reviewing and approving incentive compensation plans and grants for our executive officers"; (v) "overseeing and at least annually reviewing management's assessment of major compensation-related risk exposures and the mitigation thereof"; (vi) "periodically reviewing our stock ownership guidelines and assessing compliance with such guidelines"; (vii) "periodically reviewing the Company's human capital strategies, initiatives, and programs with respect to the Company's culture, talent, recruitment, retention, and employee engagement and employee diversity, equity, and inclusion efforts"; (viii) "periodically reviewing and recommending to the Board of Directors the type and amount of compensation paid to directors"; and (ix) "considering the results of stockholder advisory votes on executive compensation and the frequency of such votes."

41.     Uber's Corporate Governance Guidelines apply to Uber's directors and officers as well as its other representatives.  As to the Board, Uber's Corporate Governance Guidelines confirm the Board's ultimate responsibility for the Company's operations and polices, stating: "The Board, which is elected by the stockholders, is the ultimate decision-making body of the Company, except with respect to those matters reserved to the stockholders."  Continuing the

Corporate Governance Guidelines state: "The Board oversees the Company's business affairs and integrity and works with the Chief Executive Officer (the "CEO") and other members of senior management to determine the Company's long-term strategy and mission, with the goal of ensuring that the long-term interests of the Company's stockholders are being served.…"

42.     The Guidelines also confirm the Board's direct responsibility for risk oversight, stating:  "The Board oversees risk management, including the Company's compliance with applicable laws and regulations and cybersecurity risk management."  As to Uber's senior executives and their role in informing the Board of company issues, the Corporate Governance Guidelines state: "Senior management periodically reports to the Board and its committees on risk tolerance, assessment, and mitigation.  Each of the Board's committees reports to the Board on those matters."

43.     The Corporate Governance Guidelines also speak to corporate ethics and the high ethical expectations placed on Uber directors, officers and employees, stating: "The Board expects its directors, as well as officers and employees, to act with the highest standards of responsibility, ethics and integrity."  Directors also shall act in accordance with Uber's "Code of Ethics for Directors," which provides, in relevant part, that Uber directors "must not take for themselves opportunities related to Uber's business; use the Company's property, information, or position for personal gain; or compete with the Company for business opportunities."

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44.     In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing.  Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

- 13 -

45.     During all relevant times, defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they were.  In furtherance of this plan, conspiracy, and course of conduct, defendants collectively and individually took the actions set forth herein.

46.     The purpose and effect of defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, and corporate waste; and (b) disguise and misrepresent Uber's actual business and financial prospects and the risk of sexual assault that its ride sharing app posed to women.

47.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to release improper statements purposefully, and/or recklessly.  Because the actions described herein occurred under the authority of the Board, each of the defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48.     Each of the defendants aided and abetted, and rendered substantial assistance, in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and in furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

49.     Uber is a company with an app that allows a passenger to hail a ride by pushing a button on a smart phone.  To boost its ridership, the Company markets directly to women through advertisements affirming women's safety and presenting Uber as a safe ride sharing option.  Far too often, for far too many women and girls, the reality has been shockingly different.  In recent

years, women passengers have regularly experienced sexual assaults or harassment by Uber drivers due to Uber leadership's neglect for passenger safety in the pursuit of profits.

### A.      Uber Experiences Rapid Expansion

50.      Launched in 2009 in San Francisco, California, today Uber is the largest ridesharing company in the world.  In 2023, the Company booked $37.2 billion in revenues, up 163.8% from 2019 when Uber became a publicly traded company.  In 2023, Uber carried passengers on over 9.4 billion trips, up 36.2% from 2019, and had approximately 6.5 million drivers and couriers.  In 2024, Uber controlled 74% of the ride-hailing market, is a darling of Wall Street, and enjoys a market capitalization of over $162.4 billion.  In 2019, after its IPO, Uber's valuation exceeded $80 billion.

51.      Uber's rapid expansion has made its top insiders rich.  For example, between 2019 and 2024, Uber's CEO pocketed over $123 million, while Uber's CFO and Chief People Officer pocketed $44.7 million and $34.3 million, respectively.  Uber's highest paid executives in 2019 through 2024 collectively pocketed more over $290 million.  Uber's directors also fared very well, taking home over $15.2 million between 2019 and 2024, for part-time work.

52.      Uber leadership's profit over passenger safety approach personally has enriched defendants and served them well.  Uber passengers have not fare nearly so well, however.

### B.      Uber's Passenger Sexual Assaults Problem

53.      With its rapid expansion, Uber has come under fire for numerous allegations of drivers committing sexual assaults.  Despite being aware by no later than June 2022, when Uber published its second U.S. Safety Report logging over 9,000 sexual assaults reports received by Uber since 2018, Uber leadership's neglect for passenger safety has and continues to endanger women and girls who use the Company's ride sharing app.

- 15 -

54.     As Uber grew rapidly, the Company also experienced a rise in passenger sexual assaults by drivers, a dangerous byproduct of Uber leadership's neglect for passenger safety in pursuit of profits.  According to some reports, there are already more than 200 Uber driver sexual assault cases, including a large multi-district litigation pending in the Northern District of California.  The Uber drivers' alleged sexual assaults on passengers most commonly involved:  (i) non-consensual sexual penetration; (ii) attempted sexual penetration; (iii) unwanted kissing on a sexual body part; (iv) unwarranted touching of a sexual body part; and (v) non-consensual kissing on a non-sexual body part, according to reporting on the victims' complaints.

55.     In one example of Uber passenger sexual assault, in a lawsuit filed in the Northern District of California on August 25, 2023, a woman going by the name Jane Doe LS 37 claims that she was sexually assaulted by her Uber driver as she attempted to exit the vehicle.  Jane Doe LS 37 alleges that as she began to exit the vehicle after arriving at her destination, the Uber driver grabbed her hand and forced her to touch his genitalia, made an inappropriate sexually charged comment, and then grabbed her by the hair and forcibly kissed her.  The complaint further alleges the sexual assault could have been avoided if Uber had properly screened its drivers and taken the thousands of previously reported sexual assault incidents seriously.

56.     In another example of passenger sexual assault, in a lawsuit filed in the Northern District of California on August 25, 2023, a plaintiff going by the name of Jane Doe LS 354 alleges that her Uber driver sexual assaulted her by touching her breasts, attempted to touch her vagina, and exposed himself, and then forced her to perform oral copulation on him.  And, in an example of a passenger rape by an Uber driver, in a lawsuit filed in the Northern District of California on August 24, 2023, a plaintiff going by the name of Jane Doe LS 159 alleges that her Uber driver

pulled over in an unknown location and raped her, then drove the plaintiff to her destination, followed her into her home, and raped her again.

57.     As a result of stories like these, public safety advocates and regulators launched inquires and investigations into passenger sexual assaults by drivers on the Uber app, including California, Massachusetts, and Texas.   The investigations center around Uber's failures to adequately screen drivers and has hired drivers with criminal histories.

### C.   Uber's Safety Reports Confirm Uber and Uber Leadership's Knowledge of the Sexual Assaults Problem

58.     Uber leadership was aware that passengers experienced sexual assaults while using Uber, based on, among other things, Uber's own U.S. Safety Reports showing high incidences of passenger sexual assaults by drivers linked to Uber.  In its first Uber U.S. Safety Report released in December 2019, Uber revealed that about 6,000 sexual assault reports were filed by Uber riders between 2017 and 2018.  In 2017 alone, more than 3,000 sexual assaults were reported.  Further, the Company revealed that there were 235 reported rape cases linked to Uber rides in 2018, up from 229 rape cases in 2017.

59.     A few years later, Uber's second U.S. Safety Report released on June 30, 2022 showed continued high incidence of sexual assaults linked to Uber rides in 2019 and 2020.  In 2019, Uber received 2,826 sexual assault reports by passengers linked to Uber drivers, including non-consensual sexual penetration, unwanted kissing on a sexual body part, unwarranted touching of a sexual body part, attempted nonconsensual sexual penetration, and non-consensual kissing on a non-sexual body part.  In 2020, Uber received 998 sexual assault reports including the same types of sexual assaults above.  The second U.S. Safety Report also showed continued incidents of rape linked to Uber rides.  In 2019, the Company revealed there were 247 cases of rape and, in 2020, there were 141 cases of rape for a total of 388 cases of rape.

60.     Despite these horrific statistics, Uber leadership tried to downplay results of the safety study, focusing on the decline in the incidence of sexual assaults linked to Uber rides while ignoring that thousands of individuals continued to be victims of sexual assault, including rape, while using Uber's ridesharing service.

**D.      Uber's False Representations About Women's Safety**

61.     Although aware of Uber's sexual assaults problem and the prevalence of passengers reporting sexual assaults or harassments by drivers, defendants caused Uber to market to women. To this end, Uber engaged in advertising and marketing campaigns aimed at women and girls to convince them that Uber is safe and reliable transportation.  Many of the advertisements, in fact, featured young women enjoying rides arranged on the Uber app, like the ones below.





**Driving women's safety forward**

**Safety features built into every ride**

62.     Uber's shareholder reports and public filings also contained material misrepresentations and/or omissions about women's safety on the Uber ridesharing platform.  On March 30, 2020, Uber released its first Proxy Statement since becoming a publicly-traded company.  Updating Uber shareholders on "Significant Progress Achieved Since [Uber's] IPO," defendants highlighted several achievements, including "[c]ontinued product innovation to improve loyalty (Rewards), access new customer segments (Comfort), and provide leading safety features."  They further noted that Uber had "[a]dded RideCheck for both riders and Drivers complementing existing safety features such as Safety Toolkit, ShareTrip and Emergency Button."

63.     Discussing enhancing driver and passenger safety, the Proxy Statement continued:

> We have tripled the size of our safety team since 2017, with more than 300 professionals now dedicated to safety for our core rides business.  We are focused

- 19 -

on building new technologies that put safety at the heart of the Uber experience, and with thousands of community operations employees dedicated to ensuring safety on our platform, we are committed to enhancing safety.  To that end, we have formed a Safety Advisory Board composed of outside experts, added additional safety features to our platform, and have strengthened our background checks in the United States.  We strive to promote the safety of our employees, Drivers, and consumers.  And because we alone cannot meet all of the safety challenges inherent in our industry, we are already working with law enforcement officials, road safety organizations, and more than 200 gender-based violence prevention experts – including the Rape, Abuse & Incest National Network (RAINN), the National Alliance to End Sexual Violence, and the National Network to End Domestic Violence – to innovate on new approaches that will raise the bar on safety in ridesharing.

64.     In Uber's March 29, 2021 Proxy Statement, defendants portrayed Uber as safe and reliable transportation for all passengers, including women and girls, and noted that Uber had "[l]aunched dozens of new programs and partnerships around the world aimed at addressing and preventing gender-based violence," "[l]aunched driver education podcasts on gender-based violence and discrimination developed by ACTO in Mexico, Aequales in Colombia, INTEC in Dominican Republic, Efecto Boomerang in Costa Rica and Guatemala, and Promundo Institute in Brazil," and "[i]n partnership with RAINN, the largest anti-sexual violence organization in the U.S., [Uber] launched mandatory sexual misconduct education for drivers in the U.S. and are rapidly expanding this education globally, in partnership with local anti-gender-based violence organizations."

65.     Additionally, in the 2021 Proxy Statement, defendants pledged Uber to "Stand for Safety" by "significantly reduced the rate of sexual assault incidents and reduced the rate of global safety incidents per million trips."  On "Safety Improvements" at Uber, the Proxy Statement continued:  "We strive to be the safest and most trusted choice for the movement of people and things.  Our goal is to continually raise the bar on safety, and we have made significant investments in safety technology and transparency related to safety incident rates.  As a result, we determined

that the achievement of certain safety goals, including reductions in U.S. motor vehicle fatalities and critical sexual assaults, was an appropriate addition to the 2020 PRSUs."

66.    In Uber's March 28, 2022 Proxy Statement, defendants identified safety as a key value essential to the Company's corporate mission to "reimagine the way the world moves for the better" by "help[ing] people go anywhere and get anything and earn their way," stating:

> **Safety never stops**. … We embed safety into everything we do.  Our relentless pursuit to make Uber safer for everyone using the platform will continue to make us the industry leader for safety.  We know the work of safety never stops, yet we can and will challenge ourselves to always be better for the communities we serve.

67.    Speaking to "Transparency" and "User Safety," the Proxy Statement continued: "We value transparency and the accountability that it brings….  Keeping safety-related information in the dark doesn't make anyone safer.  Our reporting brings hard data to bear in order to drive accountability and improve safety for Uber and the entire industry."

68.    Highlighting User Safety as a key business achievement in 2021, the 2022 Proxy Statement asserted that Uber "[m]ade progress on commitments set out in our 2019 Safety Report, including launching new safety features, rolling out driver education, and launching an Industry Sharing Safety Program."  To further reassure passengers about safety, the 2022 Proxy Statement cited so-called "Safety Improvements" made during 2021, stating:  "We strive to be the safest and most trusted choice for the movement of people and things.  Our goal is to continually raise the bar on safety, and we have made significant investments in safety technology and transparency.  As a result, we determined that the achievement of certain safety goals, including reductions in U.S. motor vehicle fatalities and critical sexual assaults, was an appropriate addition to the 2021 PRSUs…."

69.     In Uber's March 28, 2023 Proxy Statement, defendants again highlighted safety as a key value essential to Uber's mission to "reimagine the way the world moves for the better" by "help[ing] people go anywhere and get anything and earn their way," stating:

> **Safety never stops**. [] We embed safety into everything we do.  Our relentless pursuit to make Uber safer for everyone using the platform will continue to make us the industry leader for safety.  We know the work of safety never stops, yet we can and will challenge ourselves to always be better for the communities we serve.

70.     As to "User Safety," the 2023 Proxy Statement asserted that "Uber strives to create a safe environment for riders and reduce incidents that impact the physical safety of our users," and that Uber has "enhanced the services delivered by our app to promote the safety of the end-user (e.g., form protocols, ride verification, Driver background checks, and verifications)." Further, citing Uber's 2022 U.S. Safety Report, defendants claimed that "[b]ringing safety-related information to light helps us all to make the platform safer," and that "[o]ur reporting brings hard data to bear in order to drive accountability and improve safety for Uber and the entire industry."

71.     Additionally, in the 2023 Proxy Statement, defendants acknowledged the Board's receipt of reports on User Safety, including about sexual assaults linked to Uber drivers.  In the Proxy Statement, defendants stated:  "The Board receives annual updates and is actively engaged in user safety."  Defendants also explained how the Board received reports on passengers safety issues like sexual assaults, stating:  "Our Senior Vice President of Core Services reports annually to the Board on motor vehicle fatalities, physical assault fatalities, and critical sexual assaults, as well as safety product highlights."  To signal the Board's engagement around User Safety issues, the Proxy Statement highlighted that, in additional to a one-time annual report on User Safety, "[t]he Board receives regular updates regarding safety performance" as well as "progress made on safety efforts such as new products."

72.     However, as to a shareholder proposal to prepare a third-party audit on driver health and safety to, among other things, broaden Uber's "incomplete reporting" on sexual assaults to include "nonfatal attempted assault or reported long-term physical injuries or trauma," defendants reversed course and urged Uber shareholders to "vote AGAINST" the proposal.  "Our Board of Directors recommends a vote 'AGAINST' the stockholder proposal to prepare an independent third-party audit on Driver health and safety."

73.     In Uber's March 25, 2024 Proxy Statement, defendants again repeated and highlighted safety as a key value essential to Uber's mission to "reimagine the way the world moves for the better" by "help[ing] people go anywhere and get anything and earn their way," stating:

> **Safety never stops**. [] We embed safety into everything we do.  Our relentless pursuit to make Uber safer for everyone using the platform will continue to make us the industry leader for safety.  We know the work of safety never stops, yet we can and will challenge ourselves to always be better for the communities we serve.

74.     As to "User Safety," the 2024 Proxy Statement asserted that Uber "strive[s] to create a safe environment for riders and reduce incidents that impact the physical safety of our users."

75.     Additionally, in the 2024 Proxy Statement, defendants acknowledged the Board's receipt of reports on User Safety, including about sexual assaults linked to Uber drivers.  In the Proxy Statement, defendants stated: "The Board receives updates at least annually and is actively engaged in user safety.  Defendants also explained how the Board received reports on passengers safety issues like sexual assaults, stating: "Our Senior Vice President of Core Services and our Head of Safety reports to the Board on Uber's Safety Management System, which can include updates on Uber's safety policies, safety risk management and controls, and safety assurance, including reporting on critical safety incidents like motor vehicle fatalities, physical assault

fatalities, and critical sexual assault."  To signal the Board's engagement around User Safety issues, the Proxy Statement highlighted that the "full Board receives regular updates regarding safety performance, including updates on key safety performance indicators, as well as progress made on safety efforts such as new products."

76.    However, as to the renewed shareholder proposal to prepare a third-party audit on driver health and safety to, among other things, broaden Uber's incomplete reporting on sexual assaults to include " nonfatal/attempted assault, verbal abuse, carjackings/robberies, threats," defendants again urged Uber shareholders to "vote AGAINST" the proposal.

77.    Uber's Annual Reports to Uber shareholders, and filed with the SEC, also misrepresented Uber's commitment to safety.  While extolling Uber's U.S. Safety Reports and claiming that transparency around critical sexual assaults drives accountability to effect change, Uber continued to neglect safety by failing to adopt passenger safety measures.  For example, in Uber's 2020 Annual Report on SEC Form 10-K, defendants asserted that Uber's "products are built with the expertise" that "set the standard for powering movement on-demand" and "deliver safety and trust."  Defendants Khosrowshahi, Chai, Sugar, Advaithi, Burns, Eckert, Ginsberg, Martello, Thain, and Trujillo, signed the 2020 Annual Report which included a certification by defendants Khosrowshahi, and Chai that Uber's internal controls suffered no material deficiencies.

78.    Then, despite ongoing sexual assaults on its app, in Uber's 2021 Annual Report on Form 10-K, defendants against falsely stated that Uber's "products are built with the expertise" that "set the standard for powering movement on-demand" and ""deliver safety and trust." Defendants Khosrowshahi, Chai, Sugar, Burns, Ginsberg, Martello, Thain, and Trujillo signed the 2021 Annual Report which included a certification by defendants Khosrowshahi and Chai that Uber's internal controls suffered no material deficiencies.

79.    In Uber's 2022 and 2023 Annual Reports on SEC Form 10-K, defendants once again repeated their false assertions that Uber's "products are built with the expertise" that "set the standard for powering movement on-demand" and "deliver safety and trust."   Defendants Khosrowshahi, Chai, Sugar, Advaithi, Burns, Eckert, Ginsberg, Martello, Thain, Trujillo, and Wynaendts, signed the 2022 and 2023 Annual Reports which included a certification by defendant Khosrowshahi that Uber's internal controls suffered no material deficiencies.

80.    On or about April 28, 2023, Uber released its ESG report for 2023 which also discussed safety on the Uber app, including women's safety.  Specifically, defendants stated in the ESG report, in relevant part, that:

> As a global platform, we have a tremendous opportunity to help create a safe experience for all users and support broader safety outcomes.   We are committed to making the platform safer for everyone through a proactive safety management approach.

> Uber uses a global, company-wide safety management system (SMS) in order to structure and define our commitment to safety.   SMS refers to the integrated collection of safety principles, processes, and practices that are in place to enhance organizational decision-making and resource prioritization based on safety risk.   Our SMS drives organizational safety practices globally to evaluate and control for safety risks, monitor and analyze the success of safety initiatives and risk mitigations, foster a positive safety culture at Uber, and drive continuous improvement in safety.

81.    The 2023 ESG report continued:

> "Stand for safety" is embedded in Uber's company values, governance, and organizational structure.

> Our Executive Leadership Team (ELT) has accountability for company-wide safety risk and performance.  In 2020, we reorganized our Safety team to report directly to the ELT.

> Uber's Safety team drives a consistent and effective company- wide safety approach by providing independent guidance and oversight to Uber's mobility and delivery teams around the world.   The team consists of a central core team organized around safety risk management and regional teams that partner directly with local business leaders to operationalize Uber's safety standards and manage market-level risks.

82.     The 2023 ESG report further stated:

Safety reporting is embedded in our governance structure.  Uber's Board of Directors receives annual updates and is actively engaged in user safety.  The Board and management are deeply focused on the importance of safety, which is why safety is tied to our company values and serves as a performance metric for each of our most senior executives.  Uber's Senior Vice President of Core Services reports annually to the Board on motor vehicle fatalities, physical assault fatalities, and critical sexual assaults, as well as safety feature highlights.

Safety promotion includes the training, communication, consultation, and other arrangements that support our ongoing safety approach and promote a positive safety culture internally and externally.

Safety culture is the foundation of any SMS, and we're invested in promoting a positive safety culture internally and externally.

83.     At the time of these statements, Uber leadership already was aware of more than 9,000 reports of sexual assaults, some including rapes, linked to Uber drivers.  Yet, defendants continued to portray Uber as a safe ride sharing alternative for women and girls, while they continued to neglect passenger safety by failing to adopt appropriately rigorous passenger safety measures.

84.     Uber's public facing website also focused on women's safety, making statements affirming freedom from sexual assault and harassment, and highlighting purported safety features built into the Uber app.  For instance, on a "Driving women's safety forward" page of its website, Uber stated, in relevant part, that:

### Safety features built into every ride

We're dedicated to building a platform where women feel safe. That's why we partner with and learn from women who use our app, women's safety experts, and advocates to build innovative safety features and policies that empower our community of users.

### Rider accounts

We have checks and safeguards in place that help promote confident pickups and build safe communities for drivers. For instance, before a rider uses

Uber, they must provide a valid payment method and use their phone number or email address to register.

### Follow My Ride/Share My Trip

Friends and family can follow trips in real time, so drivers, riders, and their loved ones can feel more confident from pickup to dropoff.

### RideCheck®

Using sensors and GPS data, this feature can help detect if a trip doesn't go as planned. We'll check in to make sure the driver and rider are safe and provide easy access to emergency assistance features for immediate help if needed.

### Emergency assistance

The in-app Emergency Button is available to connect riders and drivers to their local emergency number with the simple tap of a button. The app displays location and trip details, so drivers and riders can quickly share them with emergency services.

85.     Further Uber's "Women's Safety Pledge" asserts that "Uber is committed to helping to end gender-based violence on our platform and in the communities we serve," and "[g]lobally we strive to partner with experts and advocates on raising awareness, offering education and resources, and designing products and policies that are trauma informed and survivor centered."

86.     Uber's campaign to boost its ridership under defendants' leadership succeeded, at least by outward appearances.  In 2023, the Company's revenues substantially increased to $37.2 billion, up 163.8% from in 2019.  Daily ridership also increased to 28 million in 2023.

**E.     Uber's Myriad Lawsuits Arising from Passenger Sexual Assaults or Harassment**

87.     However, Uber's fortunes changed for the worse recently, as the tide of sexual assault complaints, public scrutiny and civil lawsuits involving Uber drivers sexual assaulting passengers came to ahead.  In 2022, women passengers subjected to sexual assaults by Uber driver

began filing class action lawsuits seeking damages and other relief against Uber for neglecting passenger safety.

88.     In an action filed in the San Francisco Superior Court on July 13, 2022, for instance, the named plaintiffs asserted claims for damages against Uber, alleging that they experienced sexual assaults or harassment by Uber drivers.  One of the women alleged that, in February 2022, an Uber driver sexually assaulted and attempted to rape a woman who was a passenger in his vehicle in Chino Hills, California.  Another woman alleged that, in November 2021, an Uber driver fondled and raped a passenger in Perris, California.  Another woman alleged that, in August 2021, an Uber driver convinced a woman passenger to sit in the front seat of his vehicle, where he forcefully kissed her and sexually assaulted her.  Another woman alleged that, in October 2021, an Uber driver attempted to rape a woman outside Pittsburgh, Pennsylvania, rather than take her safely to her destination.  Another woman also alleged that, in October 2021, an Uber driver attempted to rape a woman passenger in Boston, Massachusetts.  According to the plaintiffs' lawsuit, Uber prioritized growth over passenger safety, resulting in sexual assaults on passengers by Uber drivers not closely screened by the Company.

89.     Since 2020, Uber's liability exposure for sexual assaults has substantially increased.  As of February 2024, Uber is named as a defendant in 399 Uber sexual assault lawsuits, including numerous actions pending in a massive multi-district class action pending in federal court in San Francisco.  *See In re Uber Technologies Sexual Assault Litigation*, MDL No. 3084. Uber has been the subject of costly inquires and investigations by state law enforcement authorities including the California Public Utilities Commission.

90.     In *In re Uber Technologies Sexual Assault Litigation*, MDL No. 3084, on October 4, 2023, a federal multi-district litigation panel centralized all Uber passenger sexual assault class

action lawsuit before the U.S. District Court for the Northern District of California in San Francisco, California.

91.     On February 15, 2024, the lead plaintiffs in the *In re Uber Technologies Sexual Assault Litigation*, MDL No. 3084, filed their operative consolidated Complaint.  The extensive Complaint alleges that Uber failed to implement appropriate safety precautions to protect passengers, and that plaintiffs suffered sexual assault or harassment as a result.  The Complaint further alleges that, although Uber was aware of the prevalence of sexual assault by Uber drivers, Uber failed to conduct adequate background checks of its drivers, train drivers regarding sexual assault and harassment, implement adequate safety measures to protect passengers from sexual assault, and adequately respond to complaints about drivers.  Additionally, the Complaint seeks monetary damages, punitive damages, and injunctive relief that could cost Uber millions.

92.     The Complaint's allegations regarding Uber's knowledge that it "faced an ongoing problem with its drivers assaulting or harassing its passengers" are especially damning.  The Complaint alleges that, despite being "fully aware of its sexual misconduct problem," Uber "failed to take precautions to protect its passengers."  The Complaint further alleges that, "[e]ven after Uber was aware of widespread sexual misconduct on the part of its drivers, Uber and its executing officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them."  Instead, the Complaint alleges, Uber "[p]rioritizing profits over safety."

93.     Further still, the Complaint alleges that "Uber and its executive officers also made the conscious decision not to warn its customers or users of the risk of being assaulted, even after Uber and its leadership were fully aware of this risk."  Safety precautions that Uber leadership could have adopted (but did not) to improve women's passenger safety include, among other

things: (i) "enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; and ongoing monitoring of Uber drivers and rides through available technology including cameras and GPS."

94.     Nevertheless, Uber's Board has not taken legal action against defendants for neglecting passenger safety.  Defendants' knowing neglect of passenger safety, and/or willful blindness toward sexual assault on women passengers by Uber drivers, in their pursuit of corporate and personal profits, has damaged the Company.

## DAMAGE TO UBER

95.     Uber has and will continue to suffer damages, injuries and losses arising from defendants' misconduct.  Among other things, Uber is now a defendant in hundreds of lawsuits arising from alleged passenger sexual assaults linked to Uber drivers.  In the highest profile action, a federal multi-district litigation, on October 4, 2023, a federal panel ordered Uber passenger sexual assault class action lawsuit consolidated and centralized in federal court in San Francisco, California.

96.     Defendants have not fared nearly so badly.  Collectively, defendants pocketed more than $217 million in executive compensation and directors' fees not justified by the Company's performance while under their stewardship.  Uber's CEO alone took home more than $123 million, in addition to more than $30.4 million in insider trading proceeds, while Uber falsely represented that its app was safe for women and girls when, in fact, it was not.  As detailed above, Uber had a passenger sexual assault problem that Uber leadership neglected by failing to mandate appropriate safety measures.  Nonetheless, the Board has not – and will not – protect the Company's interests by bringing legal action against the directors and officers responsible for this debacle.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTY

97.     Defendants' pursuits of personal profits over passenger safety are antagonistic to Uber's primary – existential – purpose as a ride hailing company, *i.e.*, to transport passengers from point A to point B safely.  Although aware of more than 9,000 sexual assaults of passengers linked to Uber drivers, defendants neglected to adopt myriad safety measures.  Rather than adopt rigorous internal controls, including passenger safety measures like biometrics, in-car cameras and/or enhanced driver background checks and screening, Uber used a cursory background check process that enabled drivers to more quickly sign-up for Uber, driving up Uber's profits.  Uber's superficial safety efforts on defendants' watch allowed drivers with histories of sexual misconduct to sign-up for Uber and then continue driving for Uber with disastrous results.

98.     Defendants who joined Uber after 2019 cannot credibly disclaim awareness or knowledge of Uber's sexual assault problem.  In December 2019 and June 2022, Uber published data on passenger sexual assaults and rapes linked to Uber drivers.  The two U.S. Safety Reports shows a prevalence of sexual assaults of women who used Uber's ridesharing app in the United States.

99.     As detailed herein, defendants' knowing and/or willful blindness to Uber's sexual assaults problems has damaged the Company.

## DERIVATIVE ALLEGATIONS

100.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.     Plaintiff brings this action derivatively on behalf of Uber to redress injuries suffered, and to be suffered, by Uber because of defendants' faithless and unlawful misconduct. Plaintiff will adequately and fairly represent the interests of Uber in enforcing and prosecuting the derivative claims.

102.    The current Board of Directors of Uber has 11 members:  Dara Khosrowshahi, Ronald Sugar, Ursula Burns, Wan Ling Martello, John Thain, David Trujillo, Amanda Ginsberg, Robert Eckert, Revathi Advaithi, Alexander Wynaendts, and non-defendant Turqi Alnowaiser.

103.    A pre-suit demand on the Uber Board is excused in this case because at least a of majority of its members are disabled from fairly, independently and objectively considering any pre-suit demand that plaintiff may have made.

104.    First, the members of the Uber Board participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Uber's shareholders or recklessly disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees and directors in attendance at management and/or Board meetings, each of the defendants knew, or recklessly disregarded, adverse, the existence and rise in sexual assaults against rideshare passengers by Uber drivers.  Further, despite such knowledge, the Uber Board neglected to adopt protocols to keep passengers safe and free from actual or threatened sexual assault by drivers. Therefore, a majority of the members of the Uber Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other defendants who did.

105.    Second, defendants Khosrowshahi, Sugar, Burns, Martello, Thain, Trujillo, Ginsberg, Eckert, Advaithi, and Wynaendts, breached their fiduciary duties by failing to implement board-level mechanisms for oversight to ensure Uber's adoption of safety protocols designed to protect passengers from sexual assault by Uber drivers.  For instance, Uber's Board,

at all relevant times, lacked a Passenger Safety Committee.  Safe transport of passengers from one place to another is an essential and mission-critical element of Uber's business and, therefore, a non-delegable oversight duty of Uber's directors.  Nevertheless, the above defendants, in breach of their fiduciary duties, delegated their non-delegable oversight duty to ensure (i) Uber's legal compliance with laws against sex assault; and (ii) Uber's adoption of passenger safety measures to protect rideshare passengers against sexual assault by drivers.

106.    Third, a majority of the members of Uber's Board has demonstrated an unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies.  Therefore, defendants Khosrowshahi, Sugar, Burns, Wan Martello, Thain, Trujillo, Ginsberg, Eckert, Advaithi, and Wynaendts, are not able to and will not vigorously prosecute any such action.

107.    Fourth, any suit by the directors of Uber to remedy these wrongs would likely expose the liability of defendants under applicable federal and state laws, which could result in lawsuits being filed against one or more of the defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

108.    Fifth, the members of Uber's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.  Therefore, a demand upon the Uber Board is excused as futile.

109.    Sixth, defendant Khosrowshahi is employed full time by Uber as its CEO and has received and will continue to receive substantial monetary compensation because of that employment.  Defendant Khosrowshahi will act to preserve and not threaten his position of control and the perquisites thereof.   Therefore, defendant Khosrowshahi is incapable of exercising independent objective judgment in deciding whether to bring this action against Uber's directors.

110.    Seventh, the members of Uber's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

111.    Plaintiff has not made any demand on shareholders of Uber to institute this action since such demand would be a futile and useless act for the following reasons:  (i) Uber is a publicly traded company with more than 2.07 billion shares outstanding, and thousands of shareholders; (ii) making demand on that many shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and (iii) making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## CLAIMS FOR RELIEF

## COUNT I

### (Breach of Fiduciary Duty Against Defendants)

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    Defendants owed Uber fiduciary duties of care, good faith and loyalty.  By reason of their fiduciary relationships, defendants owed Uber the highest obligations of due care, diligence, good faith, honest and truthful disclosure, and conflict-free loyalty in the direction and

oversight of the Company.  Defendants breached their fiduciary duties to Uber by engaging in the unlawful misconduct detailed above.  As a direct and proximate result of defendants' breaches of fiduciary duty, Uber has sustained significant damages, injuries and losses.  Plaintiff seeks damages and other relief for Uber.

## COUNT II

### (Unjust Enrichment Against Defendants)

114.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of, and to the detriment of, Uber.  Plaintiff, as a shareholder and representative of Uber, seeks restitution from defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by defendants, and each of them, from their wrongful conduct and fiduciary breaches.  Plaintiff seeks damages and other relief for Uber.

## COUNT III

### (Corporate Waste Against Defendants)

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    Although defendants owed Uber a duty to avoid wasting its valuable corporate assets, they did not.  The sexual assault incidents against passengers by Uber drivers has cost Uber millions of dollars in revenues, expenses, goodwill and reputational loss.  Uber also has been exposed to myriad litigation and litigation risks, including lawsuits filed by federal law enforcement authorities, shareholders and passengers.  As a result of defendants' corporate waste, Uber has sustained significant damages, injuries and losses.  Plaintiff seeks damages and other relief for Uber.

**COUNT IV**

**(For Contribution Under Delaware Law
Against All Defendants)**

118.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.   Plaintiff brings this claim derivatively on behalf of Uber for contribution defendants.

120.   Uber is named as a defendant in, among other matters, the federal Uber sexual assault passenger MDL action.  If Uber is found liable for violating the law in connection with one or more of the actions consolidated in the MDL litigation, the Company's liability will arise, in whole or in part, from the knowing or reckless unlawful acts or omissions of some or all of defendants as alleged herein.

121.   Accordingly, Uber is entitled to all appropriate contribution from defendants, who are responsible for exposing Uber to liability.

**COUNT V**

**(For Violation of §14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9
Against All Defendants)**

122.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegations of, or reference to any allegations of fraud, scienter or recklessness with regard to this claim.

123.   Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9(a).

124.    The 2021-2024 Proxy Statements (together, "Proxy Statements") violated §14(a) and Rule 14a-9 because they contained misrepresentations and/or omissions about women's safety on the Uber ridesharing platform, facts that defendants were aware of and participated in as set forth herein.  Further, defendants used the materially false and misleading Proxy Statements to secure the directors election to Uber's Board, as well as obtain shareholder approval of executive compensation via advisory say-on-pay votes.

125.    In the exercise of reasonable care, defendants should have known that the Proxy Statements were materially false and misleading when issued.

126.    The misrepresentations and omissions in the Proxy Statements were material to plaintiff and would be material to reasonable investors who voted on each Proxy Statement.  The Proxy Statements were an essential link in Uber shareholders following the Company's recommendation to re-elect defendants to the Uber Board and approve the executive pay packages, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions and the executive officers' compensation.

127.    The Company was damaged because of the material misrepresentations and omissions in the Proxy Statements.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all defendants for the damages sustained by Uber because of defendants' wrongdoing as alleged herein;

**B.**     Awarding Uber restitution from defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by each of them;

**C.**     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, and experts' fees, costs, and expenses; and

**D.**     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  March 29 2024                        ROBBINS GELLER RUDMAN
                                                            & DOWD LLP


                                                        *s/ Christopher H. Lyons*
                                                        CHRISTOPHER H. LYONS (#5493)
                                                        TAYLER D. BOLTON (#6640)
                                                        1521 Concord Pike, Suite 301
                                                        Wilmington, DE 19803
                                                        (302) 467-2660

                                                        ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                                        BENNY C. GOODMAN III
                                                        655 West Broadway, Suite 1900
                                                        San Diego, CA  92101
                                                        (619) 231-1058

                                                        JOHNSON FISTEL, LLP
                                                        MICHAEL I. FISTEL, JR.
                                                        MARY ELLEN CONNER
                                                        ENOCH P. HICKS
                                                        40 Powder Springs Street
                                                        Marietta, GA  30064
                                                        (470) 632-6000

                                                        Attorneys for Plaintiff